AMANDA MILLER LYNCH, Appellant, v. CHARLES KLEINDOLPH, Appellee.

**NEW TRIAL:** Grounds—Undue Association of Party and Juror. The fact that the defendant in an action and one of the jurors, during a noon recess in the trial, rode together to the home of the defendant

and had dinner together, and looked over the defendant's premises, and then returned to the court, without mentioning the action then on trial, furnishes plaintiff, against whom verdict was rendered, absolute grounds for a new trial.

Headnote 1:   29 Cyc. pp. 796, 803.

Headnote 1:   19 L. R. A. (N. S.) 733; 49 L. R. A. (N. S.) 889; 20 R. C. L. 255, 256.

*Appeal from Muscatine District Court.*—D. V. JACKSON, Judge.

NOVEMBER 15, 1927.

An action for damages resulting from an automobile collision. The jury returned a verdict for the defendant. From an adverse ruling on a motion for a new trial plaintiff appeals.
—*Reversed.*

*Nichols, Tipton & Tipton,* for appellant.

*H. M. Bartlett,* for appellee.

ALBERT, J.—But one question is involved in this appeal: to wit, the ruling of the court on a motion for a new trial and to arrest judgment. The only question raised is the alleged misconduct of one of the jurors, growing out of the following facts:

While the case was in the process of trial, and at the noon adjournment on October 2, 1925, before the case had gone to the jury, the events occurred on which this motion was made. Charles Kleindolph, defendant, had charge of the county home in Muscatine County, which was located some miles from the county seat, where the case was being tried. On the day in question, defendant was going home at the noon hour in his automobile. A juror by the name of Banks approached, remarking that he had never been out to the poor farm, and that he would like to ride out and look the place over. Kleindolph replied, "All right;" they got into the automobile, and rode to the poor farm. Banks looked the farm over, and, as dinner was already prepared, Kleindolph invited Banks to have dinner with the family. After dinner, they rode back in the automobile to the courthouse. They were gone not exceeding an hour and a

half.  Kleindolph testified, by way of affidavit, that the case on trial was never mentioned at any time.  It is upon these circumstances that appellant bottoms her claim for a new trial. The record shows that this matter did not come to the attention of the plaintiff or her attorney until after the verdict of the jury.

The question involved herein is of a more serious character than would appear at first blush.  There is probably no more interesting or fascinating question involved in the history of courts than the origin and development of the jury system. It is one of the most vital elements of our system of government.  So far as the average citizen is concerned, he is less in touch with the executive and legislative departments.  When he is confronted with private or public differences, he naturally turns to the courts for relief.  His faith in the courts must be encouraged.  When the time comes that our people lose faith in the courts, our form of government is fast nearing its end.  It is meet and proper, therefore, that on questions of this kind the ruling should be such as to support the faith of litigants in our judicial system.  That faith can only be sustained by keeping our judicial proceedings not only free from wrong, but free from all suspicion of wrong.  In other words, all our court proceedings should be like Caesar's wife,—''above suspicion.''

The question before us is not a question of whether any actual wrong resulted from the association of this defendant with the juror, under the circumstances related, but whether it created a condition from which the opposing litigants and the general public might suspect that wrong resulted from this association.  It is not a question of whether both the defendant and the juror were high-class citizens, and would not be guilty of discussing this lawsuit on this trip, but rather a question of whether or not this conduct should be countenanced by the court.  The struggle courts have ever made, from the early history of the jury system, has been to attain such perfection as that the matter in dispute between the parties should be submitted to a jury of unbiased and unprejudiced minds, and that the jury should determine the matter wholly upon the evidence submitted to them in court, unbiased and uninfluenced by anything they might have heard or seen outside of the actual trial of the case.  Many rules and limitations have been put upon

jurors, to attain this end, and we are of the opinion, under the circumstances related in this case, that the district court should have granted a new trial. It is true that in the granting of a new trial the discretion of the district court is large. He is familiar with the case, the parties connected therewith, and the circumstances surrounding it; yet we feel that this question is so vital and so far-reaching in its effect that we ought to place our stamp of disapproval thereon, to the end that, for the benefit of litigants at least, a jury's verdict should be above suspicion. As illustrative of this thought of the struggle of courts to keep the jury system free from suspicion, we cite, among many, the following cases: *Cottle v. Cottle*, 6 Me. 116, 117, where it is said:

"The party obtaining a verdict in this case did, during the session of the court at which his action was tried, carry one of the jury to whom his cause was submitted, knowing him to be a juror, several miles in a sleigh to the house of a friend of the party, where the juror was gratuitously provided with refreshment and lodging. Whether furnished at the party's own house, or at the house of another by his procurement, either as an act of hospitality, or for a pecuniary compensation to be paid by the party, it is equally exceptionable. This is by statute made a sufficient reason, at the discretion of the court, to set aside the verdict. * * * There is no doubt also that, at common law, independent of the statute, it would afford just ground for the interposition of the court. There is too much reason to believe the party intended to practice with the juror. He sought his society, and attempted to impress his mind with the justice of his claim. It is insisted that the juror was not in fact influenced, and that justice has been done between the parties. It may be so; but it may be useful to the party to learn that a good cause may be injured, but cannot be promoted, by conduct of this sort, and to the public generally to know that it will be tolerated in no case whatever."

In *Knight v. Inhabitants of Freeport*, 13 Mass. 218, that court said:

"Too much care and precaution cannot be used to preserve the purity of jury trials. The attempt to influence the juror in this case was grossly improper, and ought to be discountenanced. It is not necessary to show that the mind of the juror,

766 LYNCH v. KLEINDOLPH.	[204 Iowa

thus tampered with, was influenced by this attempt. Perhaps it is not in his power to say whether he was influenced or not. If he was, there is sufficient cause to set aside the verdict; and if he was not, and the party who has gained the verdict has a good cause, he will still be entitled to a verdict upon another trial. We cannot be too strict in guarding trials by jury from improper influence. This strictness is necessary to give due confidence to parties in the results of their causes; and everyone ought to know that for any, even the least, intermeddling with jurors, a verdict will always be set aside.''

In the case of *Mobile & O. R. Co. v. Davis*, 130 Ill. 146 (22 N. E. 850), the court, in discussing a similar question, said:

''The jury box must be free from improper influences. Any association of any kind by either party, or the counsel of either party, to a cause on trial, with any one of the jurymen, is calculated to give rise to suspicion and uncertainty as to the fairness of the verdict. If the administration of justice is to be kept pure and above reproach, every appearance of a want of impartiality on the part of juries must be discountenanced. In the present case, Davis and the railroad company were each entitled to a fair and impartial trial of the controversy between them. The settlement of a long pending lawsuit may have inspired Allen with such a feeling of gratitude as to bias his judgment as a juror. The sense of obligation for a favor received is a subtle emotion, and often unconsciously dominates the faculties. It is better that a juryman rest under no obligation, nor under any apparent obligation, to either of the parties upon whose rights he is called upon to adjudicate.''

In *Harrington v. Calhoun Probate Judge*, 153 Mich. 660 (117 N. W. 62), the jury was to determine the necessity of a drainage district, and also to assess the damage. They accepted entertainment from, and were repeatedly treated to cigars by, certain of the petitioners for the drain, who were interested in its construction. The lower court there said:

'' * * * it does not seem to me that the court can say that the mere exchange of such courtesies as are indicated in this record unduly influenced the judgment of 12 men whose integrity and standing as citizens was passed upon by the relators' counsel at the time of their selection as jurors.''

The Supreme Court said:

"We cannot approve of this reasoning. While a judge or juror is determining a controversy, he should accept no favors from a party interested therein. Such favors are usually extended for the purpose of improperly influencing his judgment, and, if he accepts them, and decides in favor of the party extending them, he justly subjects himself to severe criticism. Judicial proceedings will become a mockery if such conduct is tolerated, for every suitor will be encouraged to compete in schemes of corruption."

In *State v. Snow*, 130 Minn. 206 (153 N. W. 526), the court said:

"But where the misconduct is upon the prompting or with the participation of a party to the action, or of a person interested in its outcome, a different case is presented, and the courts have dealt vigorously with such misconduct. The acceptance by jurors of refreshment or favors at the expense of interested persons has been considered decisive misconduct, and has been uniformly held to be ground for a new trial. * * * If jurors are to dispense justice fairly, and if their verdicts are to retain the confidence and respect of litigants and the public generally, the purity of jury trials must be jealously guarded. We know of nothing more likely to breed distrust of the result of a jury trial than undue familiarity between jurors and persons interested in the outcome of the litigation. In the nature of things, it is impossible to directly prove prejudice from such association, and exact proof is not required. * * * It may not be easy to say just what extent of association between parties and jurors will be required, to warrant setting aside a verdict. It is not necessary that we should here draw the line. In dealing with such questions, the court should not be captious enough to act upon trifles; but, if the association between the jurors and the prevailing party is such as to cause well-grounded fear as to the fairness of the verdict, it should be set aside."

In a later Minnesota case, *Magnuson v. Bouck*, 168 Minn. 39 (209 N. W. 896), the court had a set of facts almost identical with those in the case at bar. In relation thereto, that court said:

"Here was not only familiarity and opportunity for secret communication, but a favor bestowed for a seemingly unlawful

purpose by the prevailing party. Even giving the fullest effect to the learned trial court's conclusion that no influence was sought to be exerted by Bouck the 20 minutes he was alone with the juror on the trip, still it gave such opportunity for wrong conduct, without any reasonable or at all adequate excuse for the juror and litigant placing themselves in such situation, that, in the eyes of the public, faith in the integrity of the verdict is destroyed or impaired, and there should be a new trial.''

In 20 Ruling Case Law 261, it is said:

''It is a rule of almost universal application that, if refreshments are furnished or other favors extended to a juror or to the jury by the prevailing party during the trial, and before a verdict is rendered, a new trial will be granted. It is the policy of the law to keep the jurors free from any influence that would tend to prejudice them against or in favor of either party; and therefore the rule will be enforced without regard either to the motive of the party at fault or to the actual influence of such action on the verdict.''

In *Ensign v. Harney*, 15 Neb. 330 (48 Am. Rep. 344), two of the jurors borrowed a horse and wagon from one of defendant's attorneys, to go home over Sunday, and return. In relation to this conduct, that court said, after reciting authorities from other states:

''Unless fair-minded, unbiased jurors can be selected, a trial becomes a mere farce, dependent, not upon the merits of the case, but upon extraneous circumstances, such as the bias, prejudice, or interest of the jury. To determine the competency of a juror, an oath is administered to him, and he is required to answer all questions touching his qualifications as a juror, not generally, but in that particular case. Great latitude is allowed in such an examination, and if it appears probable that the juror is not indifferent between the parties, he is excluded. Where a juror is accepted as being impartial, he must remain so during the trial. To permit him to accept favors from either party is to put him under obligations to such party, the tendency of which is to bias his judgment. Nor is it material that such favors were not intended to influence the juror, as it cannot be determined how far they may have had that effect; and such misconduct will vitiate the verdict.''

In 29 Cyc. 803, the cases are gathered in a note sustaining the text, as follows:

"It is generally ground for a new trial that members of the jury were entertained or treated during the trial by the successful party, or by his attorney or agent * * * ."

In *McGilvery v. Lawrence*, 35 S. D. 443 (152 N. W. 698), the Supreme Court of South Dakota said:

"A juror has no business, during a trial on which he is acting as a juror, to be at the place of residence of a party to the action, under the circumstances disclosed. * * * What the nature of the conversation between the juror and McKenzie and Rogers may have been is not material, and this juror and these parties may in fact have been entirely innocent of any wrong; but the circumstances are such as to justly cast suspicion upon the verdict of such a juror, and if such a verdict were to be sustained, it would cast just suspicion, in the minds of many, upon the purity of jury trials."

Turning now to the Iowa cases, we find the following:

In the case of *Hahn v. Miller*, 60 Iowa 96, the complaint was that the juror rode in a sleigh with counsel on both sides of the case. The court said:

"Without the consent of the other party or his counsel, possibly he ought not to have ridden in the sleigh, but as no objection was made at the time by plaintiff, when he could have prevented the act, we think it ought not now to be urged as a ground for disturbing the verdict."

In *Welch v. Taverner*, 78 Iowa 207, it was held that the district court properly granted a new trial where it was shown that someone not a juror slept in the same room with the jury, and made statements to one or two of the jurors respecting the character of the plaintiff, and tending to prejudice his credibility. We there said:

"Jurors must be kept free from all possible influences. When exposed thereto, it will not do to inquire into the probability as to the extent of these influences and their effect upon the verdict. There is no safety except in setting aside the verdict, in a case where acts and conversations are shown which could have influenced the jury."

The holding in the case of *Stilwell v. Stilwell*, 186 Iowa 177, amounts to no more than saying that, if the aggrieved par-

ty learns of the misconduct of a juror before the trial is closed, it is his duty to call the matter to the attention of the court; and if his complaint is legitimate, he should make an application to have the trial dismissed and a new trial ordered.

In the case of *Quenrud v. Moore-Sieg Const. Co.*, 191 Iowa 580, the court ruled the case on the proposition that the weight of the evidence showed that the transaction complained of did not occur.

In the case of *Stafford v. City of Oskaloosa*, 57 Iowa 748, we had the following situation: During the trial of the case, Sunday intervened, and one of the jurors was desirous of visiting his home, and was informed by one of the attorneys for plaintiff that he could stay at his home until morning; that the attorney and his wife intended to make a visit in the juror's neighborhood, and would take him home. This the juror did. The next day, he and the attorney and the latter's wife went together in the attorney's conveyance to the juror's home, a distance of about 16 miles. It appears that this Sunday was the anniversary of the juror's birthday, and the attorney and the juror's wife had previously arranged a celebration. The attorney brought a chair with him, which was presented to the juror. Other friends were present at the juror's home. After the celebration, the juror, the attorney, and his wife returned to the attorney's home, where the juror slept that night. It was shown that no conversation was had in regard to the case, and that the juror and the attorney and their families had been long-time friends. The court found that neither the juror nor the attorney intended any wrong. The good character and high respectability of neither were questioned. In relation to this set of facts this court said:

"We are united in the opinion that the verdict ought not to stand, in view of the transactions and association between the attorney and juror while the trial was pending. It would be extremely unsafe for the pure and correct administration of the law, through trial by jury, to permit such transactions. In this case, the high characters of the juror and attorney may offer an assurance that no wrong was done and no prejudice wrought. But the transactions were in the way of temptation, which the law will not permit jurors and attorneys to pursue. While good men, strong to resist temptation, may do no evil by

such a course of conduct, weaker men may fall. The law has but one common rule to be applied to the good and bad, to the strong and the weak. To sanction the transaction in question would bring disgrace upon the administration of the law. There is absolute safety in the rule we adopt; there is danger in a different one. 'Prudence and a desire to secure a pure administration of the law demand that we adhere to it.' "

This line of authorities, both of our own state and our sister states, shows the marked and continuous effort on the part of the courts to free juries from outside influences, not only for any wrong that may come therefrom, but to avoid situations from which suspicion may be aroused. We deem this a salutary rule, and necessary, to sustain not only the dignity of the courts, but the respect of litigants and the public at large for the courts. The district court should have sustained this motion for a new trial on this ground.—*Reversed.*

EVANS, C. J., and DE GRAFF, MORLING, and WAGNER, JJ., concur.