FARMERS SAVINGS BANK OF BUNCH, Appellant, v. LESTER SMITH et al., Appellees.

No. 40378.

FEBRUARY 10, 1931.

REHEARING DENIED MAY 6, 1931.

Buell McCash, C. H. Elgin, for appellant.

Valentine & Valentine, for appellees.

MORLING, J.—Plaintiff, Farmers Savings Bank of Bunch, Iowa, in July, 1926, voted to voluntarily liquidate. J. J. Taylor was its president and also was president of a bank at Udell. A liquidating committee was appointed including witnesses Swaim, McFarland and Taylor, and including also a Mr. West, who is dead. Plaintiff bank held a number of notes signed by defendant Noah Smith, consisting according to statements sent to him March 10, 1927, of the note in controversy for $1500, two for $300 each, one for $1463.42. On these there was then, according to the statement, due $3238.09, less allowance to defendants of his bank stock of $1200. Defendant Noah Smith also had previously owed to plaintiff a note of $256, which he paid February 1, 1927, he says by check. Defendant Noah Smith and his family owned stock in the plaintiff bank to the amount of $1200. By the terms under which plaintiff was liquidating stockholders were requested to pay their obligation only down to the amount of their stock holdings. The note in controversy is for $1500 dated December 14, 1925, due in six months and is signed by defendants Lester (alias "Pete") Smith, Noah Smith and Mertie Smith, Noah's wife. Lester Smith was convicted of chicken stealing in February, 1927, and on March second was sentenced to the penitentiary. West, McFarland and Swaim called on defendant Noah Smith to obtain payment or security for the notes held by plaintiff. Swaim and McFarland, corroborated by Taylor and circumstances, say that this visit was made on March 3. Defendants say it was February first. The testimony of Swaim and McFarland is to the effect that defendants Noah and Mertie Smith said they could not pay, didn't have the money, didn't want to be sued, "to go ahead and take the livestock and make our money out of it. Said he had tried to get the money and couldn't pay them. * * * We were endeavoring to get Mr. Smith to pay his notes down to the amount of his bank stock, around $1200." The committee did not have the notes with them. Taylor had them. The committee reported

to Taylor on March third. On March fifth Taylor called on Noah Smith and wife at their residence. Taylor testifies that he told Smith that the directors sent him to get chattel security less his bank stock $1200; that when Smith paid the $256 note February first Smith said he didn't have the money, wanted time, wanted to borrow from the Udell bank and had tried to get it at Unionville, didn't pay anything. Taylor had the notes with him on this visit to defendants, but according to plaintiff's evidence lost them. Plaintiff's theory is that Taylor unconsciously left or dropped them on Smith's premises during this visit on March fifth. Defendants Noah and Mertie Smith say that they got possession of the notes on this visit but through payment then made to Taylor. They testify that the visit by the committee to them was not March third but February first; that they paid the $256 note to Taylor on that date. Noah Smith says that he then intended to pay his individual liability to the plaintiff down to approximately the amount of his capital stock; that Taylor saw him March 2, 1927. "He made a proposition about my mortgaging. I asked him before for money and he said he could back me for about four months. * * * I told him four months would not do me any good. * * * Before he left we agreed to settle with him on Saturday. I would either pay him or give him a mortgage on stock and make a new note." Nothing said about the $1200 bank stock. Smith says he paid Taylor March 5th "3200 odd dollars." There was no deduction for the stock. The notes though produced by defendants are not cancelled. In accounting for the source of the cash with which he says he paid Taylor Smith testifies that he had money in his pocket or hid away and that he had money in a fruit jar under the cement floor in the cow barn. Had had part of it six or eight months; that his son-in-law in the latter part of February gave him $600 in cash; that he didn't ask the son-in-law for the money, didn't give him any receipt or note, the son-in-law didn't know that he wanted it, never asked him to pay it back; "I spent it without him giving it to me. Just because he left it. That is all there is about it. Pete's wife gave me $1950. Don't know where she got it. I went over to her house to get it the fourth of March, 1927. It was the second day after Pete was sentenced to the penitentiary. She got it out of the house some place. * * * It was the same denom-

inations as the money I had in the cow barn. About the same as my son-in-law had in his hip pocket. It was all twenties, tens and some fives. I didn't know for sure Pete had the money. I thought he ought to have some of it. I paid part of his attorney fees for the Bloomfield trial. I don't know how I came to pay two hundred dollars on his attorney fees to Tom Goodson when I thought my son had this money but it was paid. * * * I don't know why if I had $850 or $860 in a jar in the cow barn February 1, 1927, I wanted to borrow the $1800 or $1900 for. I was keeping it to pay my interest and taxes.''

Lester's (Pete's) wife testifies that Noah came to their house March 4th to get some money. "I gave him $1950. * * * Had this money in the cellar quite a while. Don't know how long. * * * Some of it six or seven years. Take some out and put some in. * * * Got no receipt for the money. * * * No note or anything. * * * I remember of signing mortgage to Tom Goodson for his attorney fees. It is dated February 15. * * * I signed the mortgage for $360 when we had the money at home in the jar.'' Lester Smith on March 14, 1927, made sworn application for an order for a transcript at the expense of the county, which stated that it would cost $200 or $250; that he was financially unable to raise the funds, was unable to borrow, knew of no one who would pay the expense; that he had not transferred any property subsequent to the time he was charged with the offense, except for the purpose of satisfying mortgage indebtedness for which foreclosure had been threatened. He listed his property, incumbrances and debts showing among other things "note to Bunch Bank $1500. * * * Note to Bunch Bank $300. * * * Attorney's fees advanced by Noah Smith $120. Obligation of Alexander paid by Noah Smith $96. * * * All of the above described personal property is mortgaged to Noah Smith to secure the same indebtedness as that listed hereinbefore secured by the third mortgage on the real estate, totaling $2,320.''

The record is lengthy. We have set out the foregoing not as a complete statement of the evidence, but as illustrating the plaintiff's contention that the jury were guilty of such misconduct as to entitle it to a new trial, and as throwing light on the question whether as plaintiff contends and defendants deny the alleged misconduct was prejudicial.

Plaintiff contends that the verdict is contrary to the evidence, and because thereof new trial should be granted. The court is of the opinion that new trial should have been granted for misconduct of the jury, and because thereof it would be premature to now consider the question whether or not the court should have granted a new trial because the verdict is contrary to the evidence.

We may say in passing that in view of the circumstances appearing in evidence plaintiff's right of cross examination was unduly restricted.

In support of motion for new trial plaintiff filed five affidavits. Four of them by jurors. Juror Campbell states in her affidavit that "Juryman Clark and Mrs. Nelson were very active for defendants. They stated that Attorney Elgin (plaintiff's attorney) was too hard on Mr. and Mrs. Smith on account of Pete, and his (Elgin's) boy had married a Catholic and Elgin had disinherited him for it; Mrs. Nelson said her cousin had lost money in Taylor's bank. * * * Both the above statements were made in the presence of the other jurymen, and during discussion of case. Mrs. Tingle told me 'I can't write and I wonder if there will be any writing, if so, I'll be up against it as I never got beyond the second grade and don't know how to write.' She was a juryman on this case. In regard to Pete Smith's affidavit the jury, some of them, said it didn't amount to anything as he was going to lose everything anyway on account of his debts. * * * I finally yielded to the verdict on account of my physical and nervous condition, as I had been under Dr. Hickman's care for over two years. I told the jury I never believed the Smiths paid the notes. * * * The other jurymen urged me to agree to the verdict as it was costing the county too much and I could not hold out longer on account of my condition as I was too exhausted." Juror McFarland made affidavit: "Mrs. Nelson and Clark were very strong for defendants and talked for them. It was mentioned in the jury room that a school teacher had $200 in Taylor's bank and lost it all and never got a cent. I know Mrs. Campbell was almost exhausted and she looked sick to me, and I heard her say she was for plaintiff but gave over on account of her condition. I told them I would stay till the snow flew but gave in on account of her condition as she looked half dead. Mrs. Tingle, a member

of the jury, was unable to write and the others for Smith showed her how to write Smith's name. Mrs. Nelson showed her how to write the name of Smith." Juror Linden made affidavit that "after the jury retired to deliberate it was said by some of the jurors in substance that they would not believe the evidence of J. J. Taylor because they knew of cases where people had put money in his bank and never got it out. I also heard some one censure Mr. Elgin because it was claimed he disinherited his son after he married his wife." Juror Chapman made affidavit: "Mrs. Tingle could not write the name Smith and Mrs. Nelson showed her how to write the name Smith. They also said Elgin was too hard on Mr. and Mrs. Smith on account of Pete and Elgin's son had married a Catholic and had been disinherited by Elgin right in this court house. I remember Mr. Clark and Mrs. Nelson were very strong for Smiths and he talked very much for them. Someone said we should not hang on account of its costing the county so much for a new trial." A non-juror, Gray, made affidavit that on the afternoon of the last day of the trial affiant "was going up the east walk toward the Court House in the court house square and Lester Smith and W. B. Clark were ahead of me and to the left on the grass, going towards the Court House. * * * I saw them together about 1:25 o'clock. One Peterson, who lives in the vicinity of Bunch, was with them."

It is true that the trial court exercises judicial discretion in granting or refusing new trial for misconduct of the jury. It is true also that his finding of fact on conflicting evidence will ordinarily not be disturbed in this Court. Some matters set out in the affidavits would not of themselves, separately considered, be ground for new trial. New trial will not be granted for mere inconsequential gossip, statements or unsound argument in the juryroom.

Here there is no conflicting evidence. The five affidavits must be considered in their totality. The question is whether so considered they show: 1. Misconduct. 2. Resulting prejudice. In the matter of misconduct it appears without dispute that in the juryroom during the discussion of the case and in the presence of the other jurymen "Mrs. Nelson said her cousin had lost in Taylor's bank". (The statement was qualified thus: "I think she said cousin. Anyway, it was her relation that lost

money in the bank.'') It is undisputed that "It was mentioned in the juryroom that a school teacher had $200 in Taylor's bank and lost it all and never got a cent.'' It is undisputed that "It was said by some of the jurors, in substance, that they would not believe the evidence of J. J. Taylor because they knew of cases where people had put money in his bank and never got it out''. These statements were not merely matters of gossip or inconsequential discussion or bad argument only. They were affirmations of fact made by jurors as of their own knowledge in the process of arriving at their verdict. The statements were not only without support in the evidence but were contrary to the testimony brought out by defendants on Taylor's cross examination that "We paid the depositors in full.'' The statements as made disclosed a state of mind in the juryroom and grounds on which a verdict in favor of defendant was advocated for "they would not believe the evidence of J. J. Taylor because they knew of cases where people had put their money in his bank and never got it out.'' The statements were made as statements of alleged facts not shown in evidence which jurors accepted and acted upon in voting. The conclusion that must be drawn from this record is that the statements were made with the intention further of influencing other jurors. There is established then a case of misconduct. That prejudice resulted is shown not only by the jurors' assertions that "they would not believe the evidence of J. J. Taylor'' but of other facts disclosed by the affidavits. Juror Clark on the afternoon of the last day of the trial, outside the walls of the court house, was in association with defendant Lester Smith. In the juryroom "he was very strong for the Smiths and talked very much for them.'' One of the members of the jury was illiterate and apparently she and other jurors who were for Smith, thinking it necessary that she should be instructed, "they showed her how to write Smith's name.'' Members of the jury on their own alleged personal knowledge not only entertained unbelief in the testimony of Taylor, but were in an attitude of censure toward one of plaintiff's attorneys for "being too hard on Mr. and Mrs. Smith on account of Pete and Elgin's son had married a Catholic and had been disinherited by Elgin right in this court house.'' There was not only an attitude of prejudice against Taylor and plaintiff's attorney but of palliation of

"Pete Smith's affidavit as he was going to lose everything anyway on account of his debts." The frame of mind and argument of jurors was that it was important that those favoring a verdict for plaintiff "should not hang on account of it costing the county so much for a new trial." These facts are not matter of dispute. There is in the record not a word of contradiction or even palliation of them. Some matters set out in the affidavits would not of themselves be ground for new trial because of themselves apart from their setting they inhere in the verdict. We have here a case, however, of assertion by jurors of matters as facts not shown by the evidence yet inducing their conclusions and made for the purpose of inducing the same conclusion in the minds of other jurors. On this record the case presented to the trial court was not one for the exercise of judicial discretion. It was one on which plaintiff was entitled to a new trial as matter of right. Lynch v. Kleindolph, 204 Iowa 762; Skinner v. Cron, 206 Iowa 338; Jolly v. Doolittle, 169 Iowa 658; In re Estate of Merrill, 202 Iowa 837.—Reversed.

FAVILLE, C. J., and EVANS, KINDIG, and GRIMM, JJ., concur.