*246 HECHT, Justice
(concurring in part and dissenting in part).
I agree the juror’s conversation at a convenience store and her posttrial research into Knight’s age do not constitute juror misconduct warranting a new trial. I also concur with the majority’s affir-mance of the district court’s evidentiary rulings. Further, I wholeheartedly join in the majority’s recommendation of careful admonitions regarding jurors’ social media usage during trial. However, I part ways with the majority on one very important point. I believe the evidence establishes the juror and Frisbie’s stepmother were more than casual acquaintances and the juror’s interactions with her on Facebook went beyond mere expressions of empathy. I conclude the record sufficiently demonstrates the juror and the stepmother had a relationship that rendered the juror biased. Because my confidence in the fairness of the trial and the jury’s verdict is shaken by evidence of bias, I would affirm the court of appeals decision granting Webster a new trial.
“[Jjurors must be — and must be perceived to be — disinterested and impartial.” State v. Smith, 418 S.W.3d 38, 45 (Tenn.2013) (emphasis added); accord State v. Carey, 165 N.W.2d 27, 29 (Iowa 1969) (“[T]he jury is to be above suspicion.... [W]e along with all courts have zealously guarded the utter independence of jurors.”). Whether or not the juror in this case was actually biased, the circumstances presented here are such that an observer could reasonably believe she was. Cf. Carey, 165 N.W.2d at 28, 30 (granting a new trial after the county attorney’s office provided the jury with free coffee because “any member of the public who might become familiar with [the relevant facts]” could reasonably conclude it was “an intentional attempt to secure favor,” even if it genuinely was not). Even the perception of unfairness damages our judicial system. See Lynch v. Kleindolph, 204 Iowa 762, 764, 216 N.W. 2, 3 (1927) (“The question before us is not ... whether any actual wrong resulted from the association with the juror under the. circumstances [presented here], but whether it created a condition from which the opposing litigants and the general public might suspect that wrong resulted from this association.” (Emphasis added.)). I would avoid that perception and prevent that damage by granting Webster a new trial in this case. See State v. Delgado, 223 Wis.2d 270, 588 N.W.2d 1, 5 (1999) (“[T]he value of finality and the sanctity of a jury verdict must yield when juror bias undermines confidence in the fairness and impartiality of the trial.”); State v. Gesch, 167 Wis.2d 660, 482 N.W.2d 99, 103 (1992) (“Whether [a certain juror]’s presence in the jury room actually hindered [deliberations] we will never know, but what is important is the fact that it could have.”).
I. The Juror’s Actions and Omissions.
I conclude the available evidence, when considered in its entirety, weighs against the juror’s insistence she could be impartial and establishes her bias. Before trial, the juror told a few of her coworkers — the clerk of court and a court attendant — that she would probably not be selected to serve on the jury because she knew the family. Further, evidence in the posttrial record tends to prove she stated after the trial that she remained on the jury because she was not asked a specific enough question during voir dire that would allow her to disclose her relationship with the Fris-bie family. The statement to her coworkers and the posttrial statement are evidence the juror knew she had information that could reasonably be perceived as supporting a finding of bias. “She was intruding into a relation for which she believed *247 herself ineligible.” Clark v. United States, 289 U.S. 1, 10, 53 S.Ct. 465, 468, 77 L.Ed. 993, 998 (1933) (emphasis added).
Despite her acquaintance with the Fris-bie family and her belief she would be excused from service because of it, the juror did not volunteer any information about her relationship with the Frisbie family during voir dire. She later testified she did not volunteer any information because she did not know how; she thought she had to be asked a direct question to speak on the subject. However, although voir dire was not reported, the parties apparently do not dispute that another prospective juror volunteered during voir dire that he knew both the Webster family and the Frisbie family and was consequently excused from service. Having seen another prospective juror speak up, the challenged juror was on notice that she could (and should) do the same. See Delgado, 588 N.W.2d at 7 (concluding that, when four members of the voir dire panel volunteered information tending to show they would be biased, another juror was “on notice that she should reveal” similar information about herself). Accordingly, the challenged juror’s explanation that she was “dumb to the rules” is unpersuasive at best. In Delgado, the Wisconsin Supreme Court concluded that when a juror withheld material information even after other jurors disclosed similar knowledge, a trial court erred in finding no juror bias. See id. at 7-8. I believe Delgado should inform our analysis here.
After a court attendant brought the juror’s pretrial comments to the judge’s attention and expressed surprise the juror had been empaneled, the juror testified in camera during trial that she was a Face-book friend of Frisbie’s stepmother. I agree this connection alone might not support a finding that the juror harbored disqualifying bias. As the Kentucky Supreme Court has explained:
“[FJriendships” on Facebook and other similar social networking websites do not necessarily carry the same weight as true friendships or relationships in the community.... The degree of relationship between Facebook “friends” varies greatly, from passing acquaintanceships and distant relatives to close friends and family. The mere status of being a “friend” on Facebook does not reflect this nuance and fails to reveal where in the spectrum of acquaintanceship the relationship actually falls. Facebook allows only one binary choice between two individuals where they either are “friends” or are not “friends,” with no status in between.
[[Image here]]
Consequently, a juror who is a “Face-book friend” with a family member of the victim, standing alone, is arguably not enough evidence to presume juror bias sufficient to require a new trial. As with every other instance where a juror knows or is acquainted with someone closely tied to a case, it is the extent of the interaction and the scope of the relationship that is the relevant inquiry.
Sluss v. Commonwealth, 381 S.W.3d 215, 222-23 (Ky.2012). However, in this case the extent of the interaction and scope of the relationship — the “relevant inquiry” according to the Kentucky Supreme Court — reveals a closer connection than “passing acquaintanceship.” See id.
Although they were friends before trial, the nature of the relationship between the juror and Frisbie’s stepmother is most dramatically evidenced by their Facebook communication during and after trial. The stepmother posted a request for emotional support and the juror responded, through the Facebook act of “liking.” As the ma *248 jority notes, the juror’s affirmative act of responding to the request does not expressly relate to Webster’s guilt or innocence. Yet, I conclude actions establishing disqualifying bias need not rise to that high level of materiality. I think it evident that a reasonable person observing the stepmother’s request for support would have understood it was directly related to the emotional turmoil arising from the ongoing trial of the murder charge against Webster. More importantly, a reasonable person could understand the juror’s act of liking the request as the juror’s affirmative expression of emotional support for the stepmother.
This case presents more troubling facts than Oro-Jimenez v. Commonwealth, 412 S.W.3d 174, 180-81 (Ky.2013). In Oro-Jimenez, a juror conversed with a victim in a robbery case regarding “how [the victim] was doing” and stated the juror was sorry the victim had “to go through that.” Id. at 180. The Kentucky Supreme Court held this interaction did not provide grounds for a mistrial. Id. at 181. However, the interaction took place during the penalty phase, after the jury had already rendered a guilty verdict. See id. at 180. In other words, while the juror perhaps felt sympathy for the victim during trial, the juror at least waited to express that sympathy directly until after rendering a verdict on guilt. Further, I see nothing in Oro-Jimenez indicating that the juror and the victim had a social relationship that antedated the trial. In this ease, the juror’s relationship with Frisbie’s stepmother existed before the trial, and her communication during trial occurred before the jury started deliberating.
The communications evidencing a relationship between the juror and Frisbie’s stepmother continued after the trial. It seems quite clear to me that the juror’s perception of the closeness of the relationship demanded she communicate with the stepmother about the jury’s verdict. Indeed, the content of the juror’s posttrial communication in this case — “I wish you could have gotten murder in 1st degree”— carries a more troublesome substantive connotation than the manifestation of generalized empathy at issue in Oro-Jimenez. The juror’s posttrial communication in this case reveals she was motivated to return a verdict she knew her friend wanted and felt obligated to offer an explanation as to why that did not occur. It allows for the possibility that the previous Facebook expression of emotional support to the stepmother during trial really meant “I’ve got your back,” and it evidences a closer relationship than a juror and a victim’s family would or should typically share. See Lynch, 204 Iowa at 764-65, 216 N.W. at 3 (concluding “the district court should have granted a new trial” when the defendant in a civil case had lunch with a juror during trial, even though the two men had never met before and even though “the case on trial was never mentioned at any time” during the meal); cf. Clark, 289 U.S. at 11, 53 S.Ct. at 468, 77 L.Ed. at 998 (“What was sought to be attained was the choice of an impartial arbiter. What happened was the intrusion of a partisan defender.”).
II. Assurances of Impartiality.
Furthermore, I conclude the district court afforded too much weight to the juror’s professed ability to be impartial. Indeed, I find unsatisfying the notion that the principal consideration in determining bias is the potentially biased juror’s own assurances that he or she can be impartial. See Mary R. Rose & Shari Seidman Diamond, Judging Bias: Juror Confidence and Judicial Rulings on Challenges for Cause, 42 Law & Soc’y Rev. 513, 518 (2008) [hereinafter Rose & Diamond] (“[S]tudies suggest that judges declare jurors to be fair when jurors say they can be *249 fair”). I recognize that in many instances, there is no other information available, because bias challenges tend to be raised during voir dire and adjudicated on very limited inquiries attributable in part to the press of time. See Dov Fox, Neuro-Voir Dire and the Architecture of Bias, 65 Hastings L.J. 999, 1012 (2014) [hereinafter Fox] (acknowledging trial judges and lawyers conducting voir dire are often “in the precarious position of trying to read [potential jurors’] minds in an effort to ascertain outside influences that might affect the jurors’ decisionmaking”). I also recognize that some prospective jurors claim bias “as a pretext for getting out of service,” and judges therefore often approach bias claims skeptically, aiming to keep a juror eligible if possible to prevent a mass exodus from the venire. Rose & Diamond, 42 Law & Soc’y Rev. at 515-16. But this case presents neither of those features; it arises from a posttrial motion, when the judge could consider not only the juror’s testimony, but the totality of other available evidence. In this procedural posture, I think the juror’s own assurances deserve less weight and should be treated just as skeptically as those made during voir dire by a potential juror who flippantly says whatever they think will get them excused from service. See State v. Lindell, 245 Wis.2d 689, 629 N.W.2d 223, 233 (2001) (“[I]n some cases bias can be detected ... even though [the juror] pledges impartiality.”); see also Clark, 289 U.S. at 10, 53 S.Ct. at 468, 77 L.Ed. at 998 (affording little weight to a juror’s own testimony, even though she “stated to the court that her mind was free from bias,” because the other available evidence was in conflict).
Self-assessments of one’s own impartiality are often overly optimistic. See Rose & Diamond, 42 Law & Soc’y Rev. at 516 (“[P]eople often have difficulty producing accurate self-assessments of bias and find it difficult to estimate whether events or prior experiences are likely to influence them.”); see also Shari Seidman Diamond et al., Realistic Responses to the Limitations of Batson v. Kentucky, 7 Cornell J.L. & Pub. Pol’y 77, 92 (1997) [hereinafter Diamond et al.] (“People are often unable to recognize the extent to which their experiences or attitudes affect their judgments.”). Thus, “simply asking jurors whether they can be impartial is not likely to reveal with any reliability the presence or strength of many of the outside influences that they would in fact bring to bear on the questions at trial.” Fox, 65 Hastings L.J. at 1011. Jurors may say they can be impartial — even if they cannot be— for a variety of reasons, and they might even be “oblivious to the ... bias they harbor.” Id. at 1020; see also Rose & [Diamond, 42 Law & Soc’y Rev. at 516 (recognizing judges faced with a juror “who promises to be fair” must evaluate whether the juror “is perhaps underestimating the potential difficulty of remaining fair and impartial during the trial”).
The most pernicious example of overstated impartiality occurs when a juror has a personal or financial interest in the parties or the outcome, and therefore wants to be selected for or remain on the jury to influence it. See Fox, 65 Hastings L.J. at 1023-25. There are, of course, other more benign reasons jurors are so often 'confident they can be fair. For example, jurors may profess impartiality to boost their self-image because “questions suggest that it is ‘better’ to answer one way than another.” Rose & Diamond, 42 Law & Soc’y Rev. at 516. In other words, “individuals recognize that fairness is a desirable characteristic, and most people want to believé that they possess it.” Id.; see also Diamond et al, 7 Cornell J.L. & Pub. Pol’y at 90 (“[J]urors may be hesitant to reveal experiences or attitudes that would embarrass them....”); Valerie P. Hans & Alay- *250 na Jehle, Avoid Bald Men and People with Green Socks? Other Ways to Improve the Voir Dire Process in Jury Selection, 78 Chi.-Kent L. Rev. 1179, 1195 (2008) [hereinafter Hans & Jehle] (“The desire to appear favorably is a main concern of prospective jurors, and that shapes [what] they disclose.... ”). Additionally, jurors may “identify with the community or feel pressure to conform to its norms in ways that favor a particular side” — a concern that prompted the court to change venue for the trial of Timothy McVeigh because the possibility of jurors feeling “pressure to conform ... decisionmaking in a way that would serve [the] community’s perceived interests” was too great. Fox, 65 Hastings L.J. at 1029, 1031-32. Frisbie’s death was gruesome and the juror in this case acknowledged that Fair-field was abuzz both on the night Frisbie died and during Webster’s trial. I think it is entirely reasonable to conclude the community was very interested in these proceedings, and this general atmosphere of rapt attention may have influenced the juror even though she confidently testified anything she had previously heard or read about the case would not and did not affect her deliberations.
But most importantly, jurors often state they can be impartial simply because they believe the judge wants them to be. See Mark W. Bennett, Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of Batson, and Proposed Solutions, 4 Harv. L. & Pol’y Rev. 149, 160 (2010) (“As a [federal] district court judge for over fifteen years, I cannot help but notice that jurors are all too likely to give me the answer that they think I want, and they almost uniformly answer that they can ‘be fair.’ ”); Diamond et al., 7 Cornell J.L. & Pub. Pol’y at 91 (“[J]urors may be hesitant to reveal opinions that they believe might engender disapproval from the judge or others.”); Kurt F. Ellison, Comment, Getting Out of the Funk : How Wisconsin Courts Can Protect Against the Threat to Impartial Jury Trials, 96 Marq. L. Rev. 953, 979 (2013) (“[J]urors’ statements of impartiality are often motivated by pressure from the judge.... ”). It is easy to capitulate when the approval of an authoritative figure might be at stake:
[J]urors may give in to the pressure to comply and say they can be impartial, even though their real feelings have not changed. The judge’s approval is important to a lot of ... jurors and many will alter their responses or hide certain attitudes in order to be perceived favorably.
Hans & Jehle, 78 Chi.-Kent L. Rev. at 1194. Of course, if a juror is just saying what they think the judge wants to hear, their words illuminate very little about whether they are actually biased. Because the juror in this case could have had other reasons for stating she could be impartial, and because the record includes other evidence of bias, I view the juror’s assurances very skeptically.
III. The District Court’s Untenable Conclusions.
Finally, in addition to the juror’s reía-tionship with Frisbie’s stepmother and the weight afforded her assurances of impartiality, I believe two of the grounds for the district court’s decision to deny Webster’s motion for new trial are clearly untenable. Trial courts have broad discretion to decide whether juror bias warrants a new trial. See State v. Johnson, 445 N.W.2d 337, 340 (Iowa 1989). However, a district court abuses that discretion if it renders a decision on clearly untenable grounds. I think the district court did so here.
First, the district court concluded any bias the juror harbored “was not reflected *251 in the verdict in which she participated,” because the jury convicted Webster of second-degree murder rather than first-degree murder. In other words, the court concluded empaneling a juror biased against a criminal defendant is harmless error if the biased person does not succeed in convincing the rest of the jury that it should return a conviction on the most serious charge available. But this principle cannot be right, because it would deny a hypothetical defendant a new trial if a juror concealed racial bias until after a trial convicting' the defendant only of a lesser included offense — but brazenly admitted it when questioned after the verdict. As Webster’s trial counsel asserted before the district court, the important consideration is not the ultimate result, but the process of reaching it:
[A biased juror] is one mind, one person, that we were deprived of having the opportunity to convince. That could have been the one hung juror, that could have been the one juror that held out until the very end and swayed everyone else. Because of what happened, we are forever denied of knowing what would have been different.
I conclude the district court’s reliance on harmless error analysis — due to the jury’s determination that Webster committed a lesser included offense — makes its decision on the bias issue clearly untenable.
Second, the district court denied Webster’s motion for new trial because there was no “indication that any ... ostensible bias influenced or infected any discussions or deliberations of the jury as a whole.” But how would we know if the juror’s bias influenced the deliberations? Our rules of evidence limit challenges to verdicts by precluding presentation of any evidence regarding jury deliberations except for the question of “whether extraneous prejudicial information was improperly brought to the jury’s attention or whether any outside influence was improperly brought to bear upon any juror.” Iowa R. Evid. 5.606(6). Jurors generally may not testify about what was said in the jury room or what did or did not motivate any juror to reach a particular verdict. Id. (“[A] juror may not testify as to any matter or statement occurring during the course of the jury’s deliberations or to the effect of anything upon that or any other juror’s mind or emotions as influencing the juror....”). In this case, any evidence the juror’s bias was manifest during deliberations would fall right in the sweet spot of rule 5.606(6) and be excluded from consideration. It was in my view clearly untenable for the district court to support its decision by citing an absence of evidence on whether bias influenced the jury’s deliberations when evidence on this question is so severely curtailed by the applicable rule.
IV. Conclusion.
When considered together and in context, the juror’s belief she would be disqualified from service if her relationship with Frisbie’s family was known, her silence during voir dire about her acquaintance with that family, her less than fulsome disclosure of recent Face-book communications with the victim’s stepmother during the in-chambers examination, and her Facebook contacts with Frisbie’s stepmother during and after trial are enough in my view to show a relationship giving rise to an inference of the juror’s actual bias. The juror insisted she could decide the ease impartially, but as I have noted, people often overestimate their own capacity for impartiality. See United States v. Burr, 25 F.Cas. 49, 50 (C.C.D.Va.1807) (No. 14692G) (“[A juror] may declare that notwithstanding [his] prejudices he is determined to listen to the evidence, and be governed by it; but the law will not *252 trust him.”); Lindell, 629 N.W.2d at 235 (“It is not always enough that a ... juror assures counsel or the court that he or she will be impartial.”). Although I strongly endorse the majority’s recommendation of careful jury admonitions regarding jurors’ use of social media during trial, I would affirm the court of appeals decision granting Webster a new trial in this case.